**UNITED STATES of America,**
**Appellee,**

v.

**Edgar RIVAS, Defendant–Appellant.**

**Docket No. 03–1649.**

United States Court of Appeals,
Second Circuit.

Argued: May 28, 2004.

Decided: July 26, 2004.

196

---

Colleen P. Cassidy, New York, N.Y., (Legal Aid Society, Federal Defender, Division Appeals Bureau, New York, N.Y., on the brief), for Defendant–Appellant.

Samuel G. Williamson, Asst. U.S. Atty., New York, N.Y. (David N. Kelley, U.S., Atty., Adam B. Siegel, Asst. U.S., Atty., New York, N.Y., on the brief), for Appellee.

Before: NEWMAN, CALABRESI, and SOTOMAYOR, Circuit Judges.

NEWMAN, Circuit Judge.

This appeal concerns a prosecutor's failure to disclose exculpatory evidence, as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Defendant–Appellant Edgar Rivas appeals from the October 9, 2003, judgment of the District Court for the Southern District of New York (John S. Martin, Jr., District Judge), sentencing him to 121 months' imprisonment after a jury found him guilty of narcotics smuggling offenses. The appeal challenges the District Court's denial of Rivas's motion for a new trial based on the Government's failure to disclose allegedly exculpatory evidence until after the jury verdict. We conclude that the evidence had a sufficiently exculpatory component to warrant a new trial. We therefore vacate the conviction and remand for a new trial.

## Background

The pertinent events occurred on board the "M/V Antwerpen." Defendant Rivas, Genebraldo Pulgar–Sanchez ("Pulgar"), and Ruddy Garcia, who is Rivas's cousin, were serving as seamen on the vessel. Rivas initially shared a cabin with Pulgar, but later roomed with Garcia. During the pertinent time frame, the Antwerpen sailed from Venezuela to Nova Scotia, back to Venezuela, and then to Newburgh, New York. Upon the ship's arrival at Newburgh, customs agents searched the cabin shared by Rivas and Garcia. The agents were acting on a tip from Pulgar, relayed by the ship's captain, that Rivas and Garcia were attempting to smuggle narcotics into the United States. Nothing was found. The captain then questioned Pulgar, who told him that the drugs were in the cabin that Rivas and Garcia shared, hidden in the ceiling and beneath the sink.

The next day, customs agents returned, and found cocaine above the ceiling tiles and beneath the sink. In the ship's recreation room, the agents frisked Rivas and seized a cell phone and a piece of paper, which had the name "German" and some phone numbers written on it. The agents then brought Rivas into the mess for an interview, where he admitted that he knew "something" was in his cabin but denied knowing what it was. He also stated that the item must have been left there by "the guy that left the room," a reference to his former roommate, Pulgar. When the agents asked Rivas about the telephone, the name "German," and the phone numbers, Rivas admitted the telephone was his, but said that he did not know who "German" was and that Garcia had given him the paper and had used the telephone. The customs agents then arrested Rivas.

Rivas and Garcia were charged with conspiracy to possess more than five kilograms of cocaine aboard a vessel arriving in the United States, in violation of 21 U.S.C. § 963, and possession of more than five kilograms of cocaine aboard a vessel

arriving in the United States in violation of 21 U.S.C. §§ 812, 955, 960(a)(2), 960(b)(1)(B), and 18 U.S.C. § 2.

At Rivas's trial, Pulgar gave the critical testimony inculpating Rivas, including the following assertions. On the Antwerpen's earlier voyages from Venezuela to Nova Scotia and back to Venezuela, he and Rivas had shared the cabin in which the drugs were found. He had seen Rivas hide drugs above the ceiling tiles and under the sink before the ship arrived in Nova Scotia. When the ship docked in Nova Scotia, Rivas asked Pulgar to make telephone calls for Rivas and said that he was expecting a delivery of drugs. Pulgar claimed that he did not know how to use Rivas's cell phone, but admitted on cross-examination that he owned two cell phones. Pulgar saw Rivas trying on a jacket and pants with drugs hidden inside them after the ship left Nova Scotia, and Rivas told Pulgar that Rivas had delivered some drugs while the ship was docked in Nova Scotia.

Pulgar testified that he had a falling out with Rivas on the voyage back to Venezuela. Pulgar then showed drugs hidden in Rivas's locker to the ship's engineer. The engineer spoke to the captain, and Pulgar was switched out of Rivas's cabin. When the ship returned to Venezuela, Garcia joined the crew and was assigned to Rivas's cabin. After the Antwerpen departed for Newburgh, Pulgar told the captain that Rivas was hiding drugs in his cabin, leading to the searches described above.

Before Rivas's trial, customs agents had questioned Pulgar regarding the drugs aboard the Antwerpen. Pulgar initially denied any involvement in drug trafficking, but later admitted that he had helped Garcia with drug trafficking on the Antwerpen during earlier voyages to New Orleans and Baltimore. As a result of his initial statements, Pulgar was convicted of making false statements and was sentenced to six months' imprisonment. At Rivas's trial, Pulgar acknowledged that the Government had given him immunity from prosecution for drug trafficking, had agreed to speak to his employer on his behalf, and had agreed to send him back to Venezuela without formal deportation proceedings, all in exchange for his testimony against Rivas.

On cross-examination, Pulgar made several admissions that lent some support to Rivas's defense theory, argued in summation, that Pulgar, not Rivas, had hidden drugs in the Rivas/Garcia cabin. Pulgar admitted that he had sailed with Garcia several times and that they had roomed together; that he had known that Garcia had unloaded drugs from the Antwerpen in New Orleans but had not told the captain; that he had picked up a bag of drug money for Garcia in Baltimore, for which Garcia had paid him $1,000; and that his falling out with Rivas had occurred when other crew members had told him that Rivas had told the captain that Pulgar was hiding drugs on board the ship. Pulgar also testified that he had a "green light" to bring alcohol on board the Antwerpen in violation of ship policy. Finally, and especially pertinent to the issue on this appeal, Pulgar testified that his last meeting with Government officials to discuss his trial testimony had occurred on January 3, 2003, the Friday before the trial had begun on Monday, January 6, 2003.

In addition to Pulgar's testimony, the Government's evidence of Rivas's guilt included evidence that Rivas kept his cabin locked and that each cabin had only two sets of keys, one for its residents and one for the ship's chief mate; and telephone records showing that Rivas had called the telephone number written under "German" on repeated occasions in February and March of 2002, and had made $300 worth

of telephone calls between March 16, 2002, and March 22, 2002.

On summation, defense counsel argued that Pulgar had falsely accused Rivas of drug possession after Rivas had accused Pulgar of the same offense. Defense counsel also noted that the Government had not offered any evidence as to how Rivas might have gotten the cocaine onto the Antwerpen.

Jury deliberations began in the afternoon of January 7, 2003. The next day, the jury requested evidence, including Pulgar's testimony. The jury also submitted a question, asking whether 28 U.S.C. § 955 required Rivas to "bring" or to "possess" a controlled substance on board a vessel entering the United States. The district court responded that either "bringing or possessing" violated federal law. That afternoon, the jury informed the District Court that it was at an "impasse." The District Court delivered a modified *Allen* charge, *see Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), and then sent the jury home. The next morning, January 9, 2003, the jury returned a verdict finding Rivas guilty on both counts.

After the trial, a Government translator revealed to defense counsel the disclosure that gives rise to the pending appeal. She reported that Pulgar had met with Government agents on January 6, 2003, the first day of the trial (after January 3, which Pulgar had testified was the date of his last meeting with Government agents). At this previously undisclosed interview, Pulgar had stated that he had carried onto the Antwerpen the cocaine found in the Rivas/Garcia cabin and described the circumstances of doing so. Prior to the ship's departure from Venezuela for Newburgh, a small launch had come alongside, and the people on the launch had given a package to Pulgar to be delivered to Rivas. Pulgar

stated that he believed the package contained alcohol and had hidden it. According to Pulgar, when Rivas retrieved the package, he told Pulgar that it contained drugs.

Defense counsel informed the Government of what the translator had reported, and the Government commenced an investigation. Ultimately, the Government wrote defense counsel that the Government did not consider the evidence exculpatory as to Rivas because Pulgar had denied knowing what the package contained when he received it and had claimed it belonged to Rivas. In the Government's view, the evidence further proved Rivas's guilt. The Government's letter contended that the facts concerning Pulgar's role in bringing the cocaine onto the ship had not been presented at trial "for sound tactical reasons." The Government elaborated this claim, contending that it had faced "a challenge to draw [Pulgar's] testimony out in a linear and comprehensible way" and that "restructuring Pulgar's examination at the last minute ... might well have confused him."

Defense counsel filed a motion for a new trial under Federal Rule of Criminal Procedure 33 on the ground that the Government had suppressed exculpatory or impeachment material, the disclosure of which would have created a reasonable possibility of a different verdict.

After hearing argument, the District Court denied the motion. Judge Martin concluded that Pulgar's previously undisclosed statement was not exculpatory because it was consistent with his trial testimony attributing ownership of the narcotics to Rivas. Although the Judge acknowledged that there was "some conceivable way the defense might have used" Pulgar's version of how the narcotics came aboard the ship, he expressed the view that the statement

would not have "materially, in any way, affected the jury's assessment of Pulgar's testimony."

Rivas was sentenced to 121 months' imprisonment, five years' supervised release, and a $200 special assessment.[1]

### Discussion

The applicable legal principles are well settled. A court of appeals reviews a district court's denial of a motion for a new trial under Rule 33 for abuse of discretion. *See United States v. Gil,* 297 F.3d 93, 101 (2d Cir.2002). A district judge's ruling is given deference because the judge presided over the trial and is in a better position than an appellate court to determine the probable effect of new evidence. *See United States v. Gonzalez,* 110 F.3d 936, 943 (2d Cir.1997). However, a new trial motion such as Rivas's invokes the equally well settled rule that the Government's failure to disclose evidence that is materially favorable to the defense violates due process. *Brady,* 373 U.S. at 87. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Impeachment evidence is evidence "having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *United States v. Avellino,* 136 F.3d 249, 255 (2d Cir.1998). Materiality of *Brady* evidence is established when there is a reasonable likelihood that disclosure of the evidence would have affected the outcome of the case, *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), or would have put the case in such a different light as to undermine confidence in the outcome, *Kyles v. Whitley,* 514 U.S. 419, 434–35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The omitted evidence is assessed in light of the entire record. *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

Before turning to an assessment of the interpreter's post-verdict disclosure of Pulgar's statement, we note with some dismay the prosecutor's failure during the trial to correct the falsity of Pulgar's testimony that his last meeting with Government officials had occurred on January 3, when in fact he had met with them on January 6, the day the trial started. This is not just a minor discrepancy about dates. The false testimony prevented defense counsel and likely the jury from learning that during the concealed interview Pulgar had admitted bringing the cocaine on board the ship. The prosecutor could readily have asked Pulgar on redirect about the last interview, or, at a minimum, alerted defense counsel and the Court to the fact that Pulgar's account was significantly incorrect.

Turning to the merits of the *Brady* issue, we agree with Judge Martin that in one sense Pulgar's disclosure is not exculpatory because it was consistent with his trial testimony that the narcotics belonged to Rivas. However, this is the unusual case where a late-disclosed statement can be viewed as having both an inculpatory and an exculpatory effect. In view of Rivas's defense that the narcotics belonged to Pulgar, the fact that Pulgar brought the narcotics on board might well have been viewed by the jury as a critical piece of evidence supporting the defense theory. The jury's question regarding whether Ri-

---

**1.** The initial judgment was entered on October 9, 2003. An amended judgment, correcting a clerical error, was entered October 20, 2003.

vas had to "bring" or "possess" the cocaine on board the Antwerpen to violate federal law suggests that the jurors may have been concerned about the manner by which the drugs had reached the ship,[2] and Judge Martin might have answered the question differently had he known that Pulgar himself had brought the drugs on board. At a minimum, the disclosure would have created a reasonable likelihood that, after hearing it, the jury's suspicion about Pulgar would have led to a reasonable doubt about Rivas's guilt. And this doubt would likely have been strengthened by Pulgar's initial denial of the interview at which he admitted bringing the narcotics on board. The disclosure would have been especially significant when added to the evidence that Pulgar had trafficked in narcotics before, had lied to customs agents about his dealings in narcotics, had shared the cabin in which the narcotics were found with Rivas, had known exactly where the narcotics were hidden within the cabin, had had a falling out with Rivas, and had been accused by Rivas of possessing narcotics on the Antwerpen.

Judge Martin based his ruling in part on his belief that Pulgar's statement was true not only as to his role in receiving the narcotics from the men in the launch but also as to his claim of not knowing the contents of the package he received. As the Judge asked defense counsel, "Why would he have told the government at all about bringing [the narcotics] on board if he was lying about it?" Defense counsel candidly acknowledged that he did not know the answer, but contended that there may have been "several reasons." One that occurs to us is that Pulgar might have thought that he had been observed receiving the package from the launch and decided that acknowledging receipt of the

package while denying knowledge of the contents was the safest way to maintain his accusation of Rivas.

In any event, Rivas should have had the opportunity to bolster the defense theory of Pulgar's guilt with evidence that Pulgar had brought the narcotics on board. The Government's "tactical reason[ ]" for non-disclosure—that having Pulgar recount his receipt of the narcotics "might well have confused him"—is totally unacceptable.

### Conclusion

The judgment is vacated, and the case remanded for a new trial.

---

**2.** Had defense counsel known that Pulgar brought the cocaine on board, she might have probed Pulgar's testimony that he believed the package contained alcohol.